## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRYAN SEXTON | : |
| | : |
| Plaintiff, | : C.A. No.: 13-cv-8557 (AT) |
| | : |
| v. | : |
| | : |
| VINCENT LECAVALIER | : MEMORANDUM IN |
| | : OPPOSITION OF PLAINTIFF'S |
| Defendants. | : MOTION TO HOLD |
| | : LECAVALIER |
| | : IN CONTEMPT PENDING |
| | : COMPLIANCE OF SUBPOENA |
| | : AND DEFENDANT'S REQUEST |
| | : FOR SANCTIONS |

Defendant, Vincent Lecavalier ("defendant" or "Lecavalier"), submits the within

Memorandum in opposition to plaintiff, Bryan Sexton's, ("plaintiff" or "Sexton"),

Motion to Hold Lecavalier in Contempt Pending Compliance with Subpoena and requests

attorney's fees and costs in addition to sanctions pursuant to 28 U.S.C. § 1927 and the

Court's inherent power for the vexatious and malicious continued harassment of

Lecavalier.

## I.    INTRODUCTION

Plaintiff first attempted to serve Lecavalier, who plays for the Flyers, at the Skate

Zone in Voorhes, New Jersey (where the Flyers practice) on October 4, 2013.  Lecavalier

was on the ice at the time and while he was not personally served, he was given a copy of

the subpoena by the front desk after practice.  Lecavalier Affidavit at ¶ 10 at Exhibit "I"

attached to Madonna's 11/18/13 letter as exhibit A thereto.  Lecavalier was aware that the

subpoena was coming because one of the respondents to the arbitration had advised him

of such.  Lecavalier retained Brooke Madonna with the law firm of Spector Gadon &

1

Rosen to represent him in connection with the subpoena.  Plaintiff served Lecavalier at some point later (presumably October 10th as claimed by plaintiff) at his personal residence.  Ex. "I" at ¶ 11.  In response to the subpoena issued by the International Centre for Dispute Resolution ("ICDR"), Lecavalier, through his counsel, timely turned over all documents in his possession responsive to the subpoena.[1]  Lecavalier produced the documents to plaintiff by email as well as by hard copy.

The production consisted mainly of emails from plaintiff to Lecavalier discussing the respondent entities as well as some financial statements of an unnamed company in which Lecavalier invested by the name of Liquid Rubber.  There was also one email between Lecavalier and respondent, Jake Karam ("Karam"), about golf.  See Lecavalier Response to Subpoena attached hereto as Exhibit "B."  The subpoena asked that electronically maintained documents be produced in their native format.  The subpoena did **not** ask that the documents be produced on a CD or that the metadata be produced.  The subpoena is also silent as to an inspection of Lecavalier's computer.  Ex. "A."  While Lecavalier produced all of the responsive documents in his possession, he did not produce same in native format because he was informed through his counsel that it was not possible because all of his emails and documents came through and were maintained on his personal gmail account and that Google does not allow its users the capability of copying emails and documents in their native format.  Lecavalier, accordingly, complied with the subpoena to the best of his ability.

---

[1] Lecavalier realized that there was one other responsive document at his home in Canada and produced it on November 18th.  The document was a stock certificate issued to Lecavalier for the shares that he held in a nonparty company.  Ex. "I" at ¶ 15.

Despite Lecavalier having satisfied the subpoena and being set to testify at the Arbitration hearing on December 13, 2013, plaintiff, through his counsel, Leslie Trager, filed a summons and complaint against Lecavalier, falsely accusing he and Ms. Madonna of conspiring with the respondents to the Arbitration to produce fraudulent documents in response to the subpoena, claiming that Lecavalier failed to produce all of the documents that Mr. Trager, without any factual basis, alleges Lecavalier has in his possession, requiring the documents to be produced in their native format despite Lecavalier's inability to produce them in that format as above-stated.[2]  This Court granted the Order to enforce the subpoena.  In response to the Court's Order, Lecavalier once again informed Mr. Trager that he had produced all of the responsive documents that he possessed and that he could not produce them in native format and even attached an Affidavit of Steve Henderson, the Director of IT at Spector Gadon & Rosen ("Mr. Henderson"), explaining why he could not produce them in their native format.

Notwithstanding Lecavalier's voluntary cooperation and compliance with the third-party subpoena and despite his testimony before the Tribunal at the Arbitration Hearing on December 13th wherein plaintiff was free to question Lecavalier as to his production and lack of involvement in any named company, Mr. Trager has, in bad faith, filed the within Motion for Contempt, falsely accusing Lecavalier and his counsel of failing to comply with the Court's Order and seeking monetary sanctions in addition to sanctions and relief to which Mr. Trager knows he is not entitled that goes beyond the subpoena and this Court's jurisdiction.  As will be discussed in detail below, Mr. Trager

---

[2] Mr. Trager made eerily similar claims against another third-party to the Arbitration and counsel to respondents in the matter of **Sexton v. Dellacato**, docketed at 1:12-cv-08984-PAC, discussed in more detail, *infa*.

has demonstrated a clear pattern and practice of seeking relief to which he is not entitled and falsely accusing third-party witnesses and counsel of conspiring to produce allegedly false documents and he should be sanctioned for such abusive conduct pursuant to 28 U.S.C. § 1927 and pursuant to the Court's inherent powers.

Lecavalier, accordingly, seeks a denial of plaintiff's Motion for Contempt as well as Lecavalier's attorneys fees and costs and further sanctions pursuant to 28 U.S.C. § 1927 and pursuant to the Court's inherent powers.

## II.    **FACTUAL BACKGROUND**

This matter arises out of what should have been a simple and quick response to a document subpoena served upon a nonparty witness, but has turned into a seemingly never-ending onslaught of harassment and abuse by the plaintiff and his counsel, Leslie Trager. By way of background, Lecavalier is a hockey player who currently plays for the Philadelphia Flyers. Back in 2004, the hockey players went on strike. During the strike, many of the players went to other countries to play. Lecavalier chose to play in the Russian league. While in Russia, he was introduced to respondents in the Sexton Arbitration matter by the name of Vladamir Shushkovsky ("Shushkovsky") and Karam for the purpose of discussing the possibility of Lecavalier investing in a start up online poker company by the name of Red Star Poker ("Red Star"). Red Star is one of the defendant companies in the Sexton Arbitration.

Lecavalier determined that while the investment sounded like it was going to be profitable, he did not feel that it was the right investment for him personally. He did, however, pass the investment opportunity along to his father, Yvon Lecavalier ("Yvon"). Yvon felt that it was a good investment and desired to invest so as to a gift to his father,

Lecavalier gave the investment money to Yvon to purchase the Red Star shares. Rather than sending the money to his father who would in turn send it to Karam, Lecavalier wired the investment money directly to Karam. The shares were issued to YCT Trust which is the trust that Yvon created to hold the shares that he purchased in Red Star. Lecavalier was not a beneficiary of YCT Trust. At no point in time did Lecavalier hold any shares in Red Star, directly or indirectly. In or about 2011, Red Star decided that it would get into other types of gambling and betting and as a result, Yvon, through YCT Trust, transferred his shares back to the company at a loss and has not held any shares in Red Star or in any other company named in the Sexton Arbitration.

Sexton apparently purchased shares in Red Star as well and according to his State of Claim, he believes that he has not been paid the proper amount of dividends and that the respondents provided him with false financial statements and shut him out of other investment opportunities. After a year and a half of discovery and being set for hearing twice, plaintiff requested that a subpoena be issued to Lecavalier seeking any documents that Lecavalier has in his possession relating to the named defendant companies in addition to other nonparty companies allegedly for the purpose of determining 1) the location of the respondent companies' offices and of the "real" Red Star Poker Company, 2) the identity of the "real" shareholders of the companies, 3) the identity of the "real" company operating Red Star and 4) the "real" returns on investment. See September 12, 2013 letter from Trager to the Tribunal setting forth his basis for seeking a nonparty subpoena to be issued to Lecavalier attached hereto as Exhibit "C." Mr. Trager's sole basis for obtaining the subpoena is that he claims that Lecavalier would possess this information solely because he was, in Mr. Trager's opinion and without any evidentiary

basis and contrary to all sworn and uncontroverted deposition testimony taken in the case, one of the largest investors in Red Star and because his friend and agent, respondent Kent Hughes ("Hughes") was an investor in Red Star. The Tribunal nonetheless issued the Lecavalier subpoena on October 2, 2013.

Lecavalier was informed by the respondents in the case that a subpoena had been issued and advised him to hire an attorney to assist. On or about October 4, 2013, Brooke Madonna of the firm Spector Gadon & Rosen ("Ms. Madonna"), was contacted in regard to representing Lecavalier in reference to the subpoena response. See Lecavalier December Arbitration Hearing Transcript attached hereto as Exhibit "D" at pp. 1405-1408. The Lecavalier Subpoena asked for documents in the possession, custody or control of Lecavalier relating to various companies including Red Star. The subpoena also asked that if any of the documents called for are maintained in electronic format, that they be produced in their native format. The subpoena did <u>not</u> request that metadata be produced or that any of the documents be downloaded to a CD and produced. See Ex. "A." Lecavalier was to either appear before the Tribunal with any responsive documents, if any, or provide same to Trager on or before November 6, 2013.

On November 5, 2013, Lecavalier, through his counsel, provided all documents that Lecavalier had in his possession, control or custody that were responsive to the subpoena.[3] See Ex. "B." The documents were provided to Mr. Trager in both a hard copy as well as a PDF version that was emailed to him. They were not provided in their

---

[3] One document was not produced on November 5th because Lecavalier did not remember that he had it in his home in Canada. That document is the Stock Certificate for his ownership of shares in a company by the name of Liquid Rubber which is not a party to the Arbitration. The document was produced on November 18, 2013. Lecavalier Affidavit at ¶ 15.

native format because all of the documents other than the Stock Certificate were sent to Lecavalier on his gmail account which is managed and operated by Google. Google does not permit its users to have the capability of copying documents in their native format. See Affidavit of Steve Henderson attached hereto as Exhibit "E." The documents produced by Lecavalier consisted mainly of emails sent to him by plaintiff Sexton, apparently in an attempt to have Lecavalier join his litigation, and documents relating to Lecavalier's investment in nonparty company, Liquid Rubber. See Ex. "B." As stated in his Response, Lecavalier was never a shareholder in Red Star or in any related company and therefore did not have documents relating thereto.

Upon receipt of the Response, Mr. Trager sent Ms. Madonna an email inexplicably questioning her veracity and representation of Lecavalier, accusing Ms. Madonna of providing a fraudulent response based upon an alleged conversation that Mr. Trager had with Lecavalier (a conversation that in reality never took place), and threatening to file a federal court action against Lecavalier if he did not;  1) allow Mr. Trager complete access to his personal computer in New Jersey (not requested in the subpoena;  2) produce the documents in native format (which Lecavalier cannot do as above-noted);  and 3) to provide the "real" documents relating to Lecavalier's "admitted investment in Red Star" (Lecavalier never admitted to being a shareholder and stated as much in his Response).  Ms. Madonna then responded to Mr. Trager informing him that he never spoke to Lecavalier[4] but rather had spoken with his father, Yvon, that Lecavalier was not a shareholder in Red Star and that Lecavalier had produced all of the responsive

---

[4] Mr. Trager knew that he had called and spoken to Yvon when he claimed otherwise in November 5th email to Ms. Madonna.

documents in possession.  A true and correct copy of the November 5, 2013 email chain is attached hereto as Exhibit "F."

On November 12, 2013, Mr. Trager wrote a letter to the Tribunal asking that they issue a subpoena to Lecavalier directing him to testify at the Arbitration on December 13, 2013 "because only through Mr. Lecavalier's testimony will there be a chance of learning the truth about his investment and the company in which he invested."  See November 12th Trager letter attached hereto as Exhibit "G."  Trager claimed he was entitled to the testimony because Ms. Madonna was allegedly not representing Lecavalier when she forwarded the supposed false production of documents.  Mr. Trager based these accusations on this conversation that he never had with Lecavalier but misrepresents that he did.  As stated above and also in Lecavalier's sworn and uncontroverted Affidavit at ¶¶ 17-20, Trager never spoke to Lecavalier but rather spoke with his father, Yvon.[5]

In response to the November 12th Trager letter, Nate Dudley, counsel for respondent Hughes, objected to the subpoena request  (See Dudley letter attached hereto as Exhibit "H").  Ms. Madonna also objected to the request in her letter dated November 18, 2013 with exhibits A-F attached hereto as Exhibit "I").  In her letter, Ms. Madonna discusses the circumstances surrounding her representation and the fact that Lecavalier did, in fact, satisfy the subpoena.  She also discusses Mr. Trager's misrepresentations to the Tribunal in an attempt to obtain Lecavalier's testimony.  Notably, both Ms. Madonna and Mr. Dudley bring to the attention of the Tribunal the clear pattern and practice of Mr.

---

[5] It is interesting to note that while Mr. Trager bases all of his future harassment and litigation on this conversation that he claims that he had with Lecavalier, when he had the opportunity to ask Lecavalier about it during the December 13, 2013 Arbitration hearing, he failed to even mention it.  This is because the conversation never took place despite Mr. Trager's continuous misrepresentations to the Tribunal and this Court that it did.

Trager accusing counsel in the proceedings of committing fraud and producing fraudulent documents. As Mr. Dudley states in his letter, Mr. Trager and his client have taken the position that "any document produced by any individual that does not support their claims is 'phony' and/or 'fake'." See Ex. "H."

Mr. Dudley and Ms. Madonna discuss the disturbingly similar circumstances surrounding the subpoena of another nonparty witness by the name of David Dellacato ("Dellacato"). The Tribunal issued a subpoena to Dellacato at the request of Mr. Trager who, like Lecavalier, timely responded to the subpoena with all of the responsive documents that he had in his possession. In turn, Mr. Trager claimed that the documents that he produced were fake (with no evidentiary basis to do so) and that counsel for respondents, Karam, Shushkovsky, Red Star and its holding company, CC Capital, Inc., Irvin Schein, participated in the production of the fake documents. Again, as with Lecavlier, he threatened to file a federal court action against him unless Dellacato permitted Mr. Trager to have unfettered access to his computer so that he could determine whether Dellacato produced the "true" documents.

When Dellacato, *pro se* at the time, refused to allow Mr. Trager to come to his house to inspect his personal computer, Mr. Trager filed an action in the Southern District of New York against Dellacato for "fraud and truth in lending" wherein he accused both Dellacato and attorney Schein of committing fraud and asking that the Court, as in Lecavalier's case, to allow him to have access to Dellacato's personal and work computer, to direct Dellacato to produce all documents responsive to the subpoena (despite the fact that he had already done so), and to conduct a hearing to hold Dellacato in contempt. At that time, Dellacato hired an attorney and a response was filed and a

hearing was held before the Honorable Paul A. Crotty.  A true and correct copy of the January 9, 2013 Dellacato Hearing Transcript is attached hereto as Exhibit "J."

During the hearing, the Court noted that under Section 7 and 9 of the Federal Arbitration Act ("FAA"), the arbitrators may subpoena a witness to appear before them and bring documents which may be material to the case.  If the witness refuses or neglects to obey the subpoena, upon petition to the United States District, the Court may compel the attendance of the witness to appear before the arbitrators or it may punish the witness for contempt.  See, Ex. "J" at pp. 25-26.  The Court goes on to state that Section 7 gives it the option of enforcing the subpoena but does not require it, and in the event the Court does enforce the subpoena, the Court's "jurisdiction is limited to compelling the attendance of witnesses at the hearing and not to discovery independent of the witnesses testifying at the hearing."  Ex. "J" at p. 26.  The Court refused to grant the request to search Dellacato's computer finding that Mr. Trager was seeking relief to which he was not entitled as the subpoena was silent as to Dellacato's computer.  It further held that Dellacato was compelled to attend the arbitration hearing as a witness and to bring the responsive documents that he had already produced pursuant to the subpoena.  The Court stated that "[t]his is all matter for the arbitrators to consider.  If it is as Mr. Trager suggests, the arbitrators will draw appropriate inferences and the circumstances."  Ex. "J" at p. 27.  The subpoena was to be enforced at the hearing before the arbitrators.  Ex. "J" at p. 28.  Dellacato was not held in contempt and the case was dismissed.

Over Mr. Dudley and Ms. Madonna's objections, the Tribunal issued a subpoena for Lecavalier's testimony at the arbitration hearing on December 13, 2013.  The Tribunal also entered an Order stating that, "the parties are directed to make

arrangements as convenient for the witness as practicable" and that the Tribunal will support a decision to have Lecavalier testify live via video-link or that they would accept a deposition transcript in lieu of live testimony.  See November 22, 2013 Order of the Tribunal at ¶ 19 attached hereto as Exhibit "K."

Lecavalier opted to appear live via video-link at the hearing but, true to form, on November 26th, Mr. Trager sent an email to Ms. Madonna stating that he wants Lecavalier in person in New York and if she will not agree, he would take it up with arbitrators.  See Trager email and Ms. Madonna's response thereto attached hereto as Exhibit "L."  His only basis for objecting to this is that he wanted Lecavalier "live" which made no sense considering he was scheduled to be "live."  Ms. Madonna did not agree to needlessly incur additional costs and inconvenience Lecavalier and brought the continued harassment to the attention of the Tribunal.  See Ex. "L."  Upon receipt of Ms. Madonna's email response, Mr. Trager then changed his reason for objecting to the live video link.  Now Mr. Trager argued that Lecavalier must be physically at the hearing in New York because "there have been some strange circumstances surrounding Mr. Lecavalier's representation and the documents allegedly produced by him."  See November 27th letter to the Tribunal objecting to Lecavalier appearing live via video-link at p. 2 attached hereto as Exhibit  "M."

While baselessly and improperly continuing to accuse Ms. Madonna of pretending to represent Lecavalier and conspiring with Lecavalier and/or the respondents to the Arbitration to produce false documents  (most of which were plaintiff's own emails to Lecavalier), Mr. Trager now claims that Lecavalier should have to personally appear in New York because; 1) when he asked Ms. Madonna, after 4:00 p.m. on a Friday, if she

would accept service of the subpoena, Ms. Madonna did not reply until Monday and she only said "yes" in the email;  2) Ms. Madonna sends emails from two different emails (bmadonna@lawsgr.com and Madonna@lawsgr.com);  and 3) there was a typo contained in the letterhead of one of Ms. Madonna's letters.  Aside from being absurd, surely this newly created basis for harassing Lecavalier and the failure of Mr. Trager to comply with the Order of the Tribunal was not an even arguably colorful basis to drag nonparty Lecavalier to New York and force him to incur needless costs and constituted nothing short of pure harassment and bad faith conduct on the part of Mr. Trager.  Upon receipt of Mr. Trager's letter, the Tribunal ordered that Lecavalier may appear live via video-link as they had said he could do in their prior Order.

Mr. Trager's harassment did not end there; rather he called Ms. Madonna's office and told Ms. Madonna's secretary that he was going to file an action against Lecavalier in the Southern District of New York for failing to produce the "real" documents.  He followed up the call with an email to Ms. Madonna stating that he had commenced an action against Lecavalier compelling him to produce documents that "he concedes exist" (a completely false statement as Lecavalier has never at any time said that he had not produced all of the documents that he had in his possession).  Mr. Trager, however, did not have the courtesy of providing a copy of the filing.  Ms. Madonna then attempted to pull the filing that night as well as the next day from PACER and it did not appear leaving Ms. Madonna to believe that it had not been filed.  Frustrated by this continued and inexplicable harassment, Ms. Madonna once again brought this to the attention of the Tribunal.  See December 3, 2013 Email of Madonna to the Tribunal seeking their assistance attached hereto as Exhibit "N."  The Tribunal responded by stating that while

they regret what is going on, they did not believe that they had the authority to help with this issue but they did strongly encourage counsel to cooperate and cautioned that "[I]f the Tribunal believes that a party's behavior (or that of its counsel) has been inappropriate and has unnecessarily increased the costs of this arbitration, the Tribunal will take that into consideration when allocating costs in the final award." See December 4th email response from the Tribunal attached hereto as Exhibit "O."

A.   **The Summons and Complaint filed against Lecavalier**

Mr. Trager finally delivered a copy of the Complaint filed against Lecavalier to produce documents that Lecavalier has steadfastly stated that he does not possess, and to produce the documents in native format which, as Mr. Trager knew, Lecavalier did not have the ability to do. The Order to Show Cause hearing was scheduled to be held at 5:00 pm on December 9th but only if Lecavalier was served by 5:00 p.m. on December 6th. Since Lecavalier was not served, Ms. Madonna did not think that the hearing would go forward. Unbeknownst to Ms. Madonna and Lecavalier, Mr. Trager filed two affidavits of service. One of the affidavits falsely stated that service of Mr. Lecavalier had been made by handing a copy of the Complaint to a receptionist in Mr. Madonna's office. While Mr. Trager did have a copy of the Complaint delivered to the receptionist, contrary to the misstatements contained in the affidavit, the receptionist is not authorized to accept service on behalf of Lecavalier or on behalf of any other client of the firm. Moreover, Ms. Madonna never agreed to accept service, nor was she even asked to do so. The second affidavit of service was filed claiming that a random security guard who is employed by a security company hired by the Wells Fargo Center (formerly the Comcast Center) had authority to accept service on behalf of Lecavalier personally. This too is a

false statement as the security guard was not authorized to do so and to date, has still not

forward the Complaint to Lecavalier who was not in Philadelphia at the time of the

alleged attempted service.

Apparently the hearing went forward and presumably based upon the Affidavits

of Service and the false statements contained therein, the Court granted the Motion to

Compel.  Rather than incur more fees in an attempt to quash the Order especially in light

of the fact that Lecavalier had already complied to the best of his ability with the

subpoena, Ms. Madonna complied with the Order by sending Mr. Trager a response on

December 12th stating that as Lecavalier has already stated in his Response to Subpoena

and again in his sworn and uncontroverted Affidavit, he has indeed provided all of the

responsive documents in his possession.  The response further stated that he does not

have any documents relating to the wire transfer that dates back to 2005 and if he had,

they would have been produced in his original response, and finally that the documents

that he has already produced in 2 different forms cannot be produced in native format

because the documents and emails are all through Lecavalier's gmail account, and

Google who owns gmail does not give its users the capability of doing so.  In an

abundance of caution, Ms. Madonna even attached the Affidavit of Mr. Henderson who is

the Director of IT Services at her firm and who is the person who regularly assists the

attorneys with such email discovery.  Mr. Henderson confirmed the inability of producing

the documents in native format.  See December 12th Response of Madonna attached

hereto as Exhibit "P."

On December 13, 2013, Lecavalier appeared lived via video-link conference at

the arbitration hearing.  Mr. Trager was allowed to ask whatever questions he desired for

an hour and a half.  While he had repeatedly made representations to the Tribunal and even to this Court about how Lecavalier's testimony was "material" to his case (which is required in order to even allow the original subpoena) and that he needed it to determine the locations of the "real" Red Star, to determine the identity of the "real" shareholders of the respondent companies and to determine the identity of  the "real" operating company of Red Star (See Ex. "C"), he asked only two questions relating thereto in the hour and a half – 1) "under what company is Red Star organized" (Lecavalier had no idea) and 2) "was Lecavalier ever told about a company named CC Capital" to which Lecavalier responded in the negative. (See Ex. "D" at pp. 1432, 1447-48).  Mr. Trager never asked if Lecavalier knew of the locations of any of the respondent companies nor did he ask the identity of any of the "real" shareholders.  Rather, Mr. Trager spent the majority of his time asking about when he was served and when Ms. Madonna was hired and trying to confuse and trick Lecavalier into saying that Ms. Madonna somehow and for some unexplained reason obtained fraudulent documents that she made appear to come from Lecavalier's email and forwarded them to Mr. Trager claiming that they were the documents produced in response to the subpoena when Lecavalier had allegedly never even spoken with her, all of which is preposterous and nonsensical.

During the hearing, Mr. Trager was able to learn that Lecavalier received the subpoena and that he discussed it along with his production with his counsel, Ms. Madonna, who he did indeed retain prior to producing them.  Mr. Trager further learned about how Lecavalier conducted his search, that he forwarded all of the responsive documents to Ms. Madonna who in turn produced them to Mr. Trager, that neither his email nor the documents produced were fraudulent, that he does not have any other

responsive documents and that Lecavalier was at no point a shareholder in Red Star, all of which are consistent with every representation made to the Tribunal and to this Court and consistent with his production and sworn affidavit.  See Exhibit "D."

**B.**     **The Motion for Contempt**

While this should have been the end of Mr. Lecavalier's *de minimus* involvement in this matter, since Lecavalier had complied as best that he could with the subpoena and having testified at the Arbitration hearing, Mr. Trager still continues to harass Lecavalier and multiply the litigation proceedings with no colorable basis.  On December 17th, Mr. Trager sent a letter Ms. Madonna stating now that Lecavalier has not complied with the subpoena, not in that he produced fraudulent documents or that he did not produce all of the documents as he had repeatedly represented to the Tribunal, but simply that he was required to produce the documents in native format which he mistakenly equates with downloading them to a disc.  He also failed to understand the affidavit of Mr. Henderson. Exasperated, Ms. Madonna responded by sending an email to Mr. Trager once again stating that Lecavalier had complied with the subpoena in that he turned over all of the responsive documents and that he was not capable of turning them over in native format, that native format is not synonymous with downloading the documents to a CD, and that the subpoena did not ask for the documents to be downloaded on a disc.  In addition, Ms. Madonna noted that the Tribunal had issued a Post Hearing Order ***prohibiting any new arguments or evidence*** so his demand to now have Lecavalier go back and download all of the documents and emails on a disc and forward it to him was baseless, moot and improper.  See December 18th email from Madonna to Trager and the Tribunal's Post Hearing Order attached hereto as Exhibit "Q" and "R" respectively.

Ms. Madonna also contacted the Tribunal to inform them of the outrageous continuous harassment of Lecavalier and to once again seek their assistance. See December 18th email from Madonna to Chairman Lindsey attached hereto as Exhibit "S." On December 19th, the Tribunal responded by noting that it "regrets that the matter of Mr. Lecavalier's subpoena remains in dispute" but that the statute permits Mr. Trager to attempt to enforce a subpoena in federal court. See December 19th response of the Tribunal attached hereto as Exhibit "T." Contrary to Mr. Trager's representation to this Court, the Tribunal did not in any way say or suggest that "additional evidence could be presented upon application to the arbitrators" as he states in Paragraph 8 of his Declaration. To the contrary, the Post Hearing Order specifically states in Paragraph 5:

> Prohibition of New Arguments or Evidence:  New arguments will not be allowed in any of the post-hearing submissions on the merits.  This prohibition includes, but is not limited to, all post-hearing submissions on the merits referenced in this Order.

In the second paragraph of the Order, it states, "this Order is intended to follow the agreement reached with the parties at the close of the merits hearing on December 13." Mr. Trager was a part of that agreement and knew, when making the false statement to this Court, that he would not be permitted to submit any new evidence or arguments in his post hearing submissions.  It is not a coincidence that Mr. Trager neglected to attach or even mention the Post Hearing Order in his submissions to this Court.

In Mr. Trager's moving papers, he is seeking multiple sanctions for Lecavalier's alleged failure to comply with this Court's December 10th Order.  He is seeking monetary sanctions, payment of his attorney's fees and costs and to have Lecavalier's personal computer turned over to him for an inspection.  Mr. Trager's Motion should be denied

because Lecavalier has satisfied the subpoena and he has not violated the Court's Order, and because Mr. Trager is seeking relief to which he is not entitled.

**C.      Lecavalier has satisfied the subpoena**

As shown above, Lecavalier has satisfied the subpoena in that he performed an appropriate search of his documents and he produced all of the responsive documents that he has in his possession, custody or control.  In addition to having sent to Mr. Trager a timely response to the subpoena, Lecavalier also submitted a sworn Affidavit and gave sworn testimony at the Arbitration Hearing, both of which were consistent with his original Response to Subpoena.  And while the subpoena did ask that electronically maintained documents be produced in their native format, Mr. Trager was informed that this was not possible because all of the documents are on Lecavalier's gmail account and it is not possible to produce them in native format.  The affidavit of Mr. Henderson supports this inability.  Lecavalier emailed the responsive documents to Mr. Trager and sent him a hard copy as well.  ***The subpoena did not ask for the documents to be downloaded to a disc or that metadata be provided***.  See Ex. "A."

**D.      Mr. Trager is confusing the terms "native format," "metadata" and "downloading to a disc**

In Mr. Trager's Declaration/Motion and well as in the supporting Memorandum, Mr. Trager is using the terms, "native format" and "metadata" and "downloading to a disc" interchangeably.  These terms and productions are not synonymous.  "Native format" is defined as "a file saved in the format as designated by the original application used to create it."  This means that, by way of example, that if a document is created in Microsoft Word, its native format would be a DOC or DOCX file.  In other words, the

"native format" refers simply to the file format in which a particular document was created.

Native format however does not refer to the "metadata" of an electronic document. "Metadata" is defined by Merriam-Webster's Dictionary as "data that provides information about other data." Metadata in a document can show, by way of example, the author, date created, date modified and file size. A document produced in native format will not necessarily show metadata and asking for a document to be produced in its native format does not equate to asking for the production of metadata of a document. More importantly, the subpoena did not seek the metadata of any electronically maintained documents.

Lastly, Mr. Trager mistakenly equates "native format" and "metadata" to copying or downloading documents on a CD. Documents can be copied or downloaded to a CD in many different formats including, *inter alia*, native format if the respondent has that capability unlike in the Lecavalier case, or in a PDF or DOC format. Documents can be copied or downloaded to a CD with or without metadata as well. Therefore, contrary to Mr. Trager's representation, simply copying or downloading the responsive documents to a CD is not commensurate with producing documents in native format. More significantly, the subpoena did not request that the documents be produced on a CD. By asking that this Court order Lecavalier to produce the documents with metadata on a CD is asking this Court to go beyond its jurisdiction by enforcing a production beyond the subpoena. This cannot be permitted.

**E.**     **Mr. Trager is seeking production beyond the Court's jurisdiction**

In addition to seeking metadata and production on a CD, both of which go beyond the subpoena and therefore, this Court's jurisdiction, Mr. Trager is now seeking an order from this Court to turn over Lecavalier's personal computer for inspection which likewise goes way beyond the subpoena. The subject subpoena is silent as to Lecavalier's computer and Mr. Trager knew that he was not entitled to inspect Lecavalier's computer when he requested this Court order such a sanction. This is just further evidence of Mr. Trager's bad faith conduct.

In the case of Sexton v. Delllacato, Mr. Trager accused Dellacato and attorney Schein of working together to provide plaintiff with false documents just like in this case. See Ex. "J." Also as in Lecavalier, Mr. Trager filed a motion to compel and for contempt despite the fact that Dellacato timely and properly complied with the subpoena. Yet another strikingly similar claim is that Mr. Trager alleges that the respondents, through attorney Schein (and now through Ms. Madonna) provided false documents in response to the third-party subpoenas that were served upon Dellacato and Lecavalier and that Dellacato and Lecavalier should be sanctioned for the allegedly false productions of attorneys Schein and Madonna. In the Dellacato matter, Mr. Trager stated that, "This is very—looks like we could be having a production here of false documents produced by (defendant Karam) in Canada for the benefit of Mr. Dellacato so he can give documents here that are not true." Mr. Trager asked that as a sanction for respondents somehow producing false documents through attorney Schein in response to Dellacarto's third-party response, that he should be entitled to inspect Dellacato's personal computer in addition to Dellacato being penalized with a monetary sanction. Ex. "J" at p.23.

Mr. Trager is likewise making **the identical** claims against Lecavalier claiming that Ms. Madonna was not representing Lecavalier at the time that she forwarded the phony production on October 7th and he states that "there is a real question as to who really produced documents on October 7 – Mr. Lecavalier or one of the respondents in the arbitration proceeding." See Declaration of Trager filed in support of Motion to Contempt at ¶ 7. Mr. Trager is incredulously arguing to this Court that Ms. Madonna, while not representing Lecavalier, conspired with the respondents whom she has never met, to produce false documents, most of which are plaintiff's own emails to Lecavalier, and that she produced the allegedly false documents making them appear to come from Lecavalier's email which, if true, would place her own license to practice law in jeopardy. This contention is beyond ridiculous and offensive. Even more shocking is that Mr. Trager is seeking monetary sanctions as well as a sanction of allowing Mr. Trager complete access to Lecavalier's personal computer as a result of Ms. Madonna's alleged false production.

Not only is this claim absurd and unfounded, but Mr. Trager knows that it is false and he is not entitled to such relief. As has already been shown, Mr. Trager has hurled the same claims and sought the same relief against Dellacato and the Court held that he was seeking relief beyond the subpoena and the Court's jurisdiction and it denied his requests for sanctions of any kind. As stated above, the Court noted that its jurisdiction was limited to enforcing the subpoena and ordering that the witness appear at the arbitration hearing. The Court further stated that it was for the Tribunal to listen to the testimony and draw the appropriate inferences as to credibility of the witnesses. The

same holds true in determining the veracity of the claims of the plaintiff and accusations of his counsel, Mr. Trager. See Ex. "J."

Lecavalier has complied to the best of his ability with the subject subpoena and Mr. Trager is improperly and shamelessly making misrepresentations to this Court just as he has done in the past and he is making false accusations of third-party witnesses and falsely accusing members of the Bar of committing fraud. Mr. Trager is also making up factual scenarios and then claiming that third-party witness Lecavalier failed to comply with these artificially created circumstances and that he should be sanctioned for same. Mr. Trager should not be rewarded for this conduct, but rather is properly sanctioned for it under 28 U.S.C. § 1927 and pursuant to the Court's inherent power.

## III.   **Memorandum of Law**

### A.   **Lecavalier complied with the subpoena and the Court's Order to the best of his ability**

As show above, Lecavalier has complied with the subject subpoena and this Court's Order to the best of his ability. Lecavalier is not able to provide the responsive documents in their native format for the reasons set forth above and supported by the Henderson affidavit. Although a failure to comply with a subpoena may support a contempt citation pursuant to Fed.R.Civ.P. 45(e), an inability to comply with the subpoena, however, constitutes an adequate excuse and a defense to a contempt motion. 28 U.S.C. 45 (e); *Kowalczyk v. U.S.*, 936 F.Supp. 1127 (E.D.N.Y.,1996). Lecavalier has shown that he is unable to comply with the subpoena and Order and therefore, the Motion for Contempt should be denied.

Moreover, plaintiff has not shown that he has been prejudiced by this failure to produce the documents in their native format. Even assuming that Mr. Trager's self-

created and unsupported allegations of a fraudulent production of documents was true,

providing the documents in their native format would not have assisted.  As Mr. Trager

states in his Motion and Memoradum, what he is really seeking is the metadata of the

documents, however, he did not request the production of same in the subpoena.  It is

improper to seek sanctions for not producing metadata or to even seek an order

compelling the production of metadata when he did not seek the production of it in the

subject subpoena.  Likewise, seeking contempt for failing to download documents to a

CD is also improper when same was not requested in the subject subpoena.  The Court

does not have jurisdiction to compel the production beyond what is contained in the

subpoena.  It logically follows that the Court cannot sanction a witness for failing to

produce documents in a form not requested in the subpoena.

Finally, the issuance of the original subpoena was improper because plaintiff

failed to show how the documents and testimony he sought were relevant ***and material*** to

his case as is required under Rule 9 of the International Business Arbitration Rules of

Evidence which follows the FAA Rules.  The subpoena should, accordingly, be quashed.

*Oceanic Transport Corp of Monrovia v. Alcoa S S Co*, 129 F.Supp. 160 (S.D.N.Y 1954)

(In proceeding on motion to punish for contempt a witness who had refused to respond to

subpoena issued in arbitration proceeding, court had duty to determine whether to compel

witness' attendance and production of papers and to determine whether proposed

evidence was material).

   **b.**   **Plaintiff and his counsel, Mr. Trager, should be sanctioned for their**
          **continuous harassment and abuse of nonparty Lecavalier and**
          **needlessly multiplying the proceedings**

This Court has the authority to impose sanctions in connection with the improper

use of the Court's subpoenas under Federal Rule of Civil Procedure 45, which provides

that "A party or attorney responsible for issuing and serving a subpoena must take

reasonable steps to avoid imposing undue burden or expense on a person subject to the

subpoena." *Kenney, Becker LLP v. Kenney*, Not Reported in F.Supp.2d, 2008 WL

1849544 (S.D.N.Y.).  This is especially so in the case of a third-party witness such as

Lecavalier. *Stolt-Nielsen SA v. Celanese AG*, 430 F.3d 567, 580 (2d Cir. 2005).   The

Court must enforce this duty and impose the appropriate sanctions upon the party or

attorney who fails to comply and even worse uses a subpoena to harass a witness.

*Becker, Id.*  The Court can use its inherent powers to impose attorney's fees "when a

party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . . [or] if a

court finds that a fraud has been practiced upon it." See *Chambers v. NASCO, Inc.*, 501

U.S. 32, 45-46 (1991) (internal quotation marks omitted).

Under its inherent power and 28 U.S.C. § 1927, this Court is empowered to hold

Mr. Trager personally liable for the costs and fees incurred by Lecavalier in defense of

this Motion and the prior Motion.  This section provides:

> [any] attorney or other person admitted to conduct cases in any court of
> the United States...who so multiples the proceedings in any case
> unreasonably and vexatiously may be required by the court to satisfy
> personally the excess costs, expenses, and attorney's fees reasonably
> incurred because of such conduct.

As this Court declared in *Pentagen Techs, Int''l Ltd. v. United States*, 172 F.Supp 2d 464, 474 (S.D.N.Y. 2001), *aff'd*, No. 02-6061, 2003 WL 1977386 (2d Cir. Apr. 23, 2003), 28 U.S.C. § 1927 authorizes sanctions "where, as here, plaintiff presents claims: (1) without a colorable basis; and (2) in bad faith."

A claim lacks any colorable basis where, as in the Lecavalier case, "it lacks any legal or factual basis." *Sierra Club v. U.S. Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985). "Bad faith" may be inferred, where as in the Lecavalier case, Mr. Trager's "'actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose." *Vishipco Line v. Charles Schwab & Co.*, No. 02 Civ. 7823, 2003 WL 1345229, at *10 (S.D.N.Y. Mar. 10, 2003)(citation omitted); *see also Hudson Motors P'ship v. Crest Leasing Enters.*, 845 F.Supp. 969, 979 (E.D.N.Y. 1994) ("'[a] court may infer intent from a total lack of factual or legal basis for a suit'") (citation omitted). As has been shown above, this action going all the way back to the seeking of the initial Lecavalier subpoena has been taken without any factual or legal basis to do so and has been taken in bad faith by Mr. Trager. Mr. Trager should, accordingly, be sanctioned for such conduct.

## IV.   **CONCLUSION**

For the reasons set forth above, the Court should deny plaintiff's Motion for Contempt and dismiss the action against Lecavalier. In addition, this Court should sanction Mr. Trager for his harassing and abusive conduct under 28 U.S.C. § 1927 and this Court's inherent powers.

Dated: January 20, 2014

SPECTOR GADON & ROSEN, P.C.


By: _/S/ Jonathan J. Greystone_____
        Jonathan J. Greystone

        Attorneys for defendant Vincent Lecavalier
        One Penn Plaza
        36th Floor
        New York, NY  10119
        (212) 786-7394